**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**NEW YORK**

|  |  |
|---|---|
| | X |
| T.N., through his Power of Attorney | : |
| | : Civil Action No.: |
| | : 1:20-cv-05387-AKH |
| Plaintiff, | : |
| | : **Judge Alvin K. Hellerstein** |
| v. | : |
| | : |
| SUTTONPARK CAPITAL LLC, SUTTONPARK | : **Jury Trial Demanded** |
| STRUCTURED SETTLEMENTS LLC | : |
| | : |
| | : |
| Defendants. | : |
| | X |

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff T.N. ("T.N." or "Plaintiff"), through his Power of Attorney, Rodney Goney ("Rodney"), on behalf of himself through undersigned counsel, Jafri Law Firm, as and for his Complaint against SuttonPark Capital LLC and SuttonPark Structured Settlements LLC (collectively, "SuttonPark") (together, "Defendants"), hereby allege:

## NATURE OF THE CLAIMS

1.      SuttonPark is the leading wholesale aggregator of structured settlements in the United States[1]. Its owner is 777 Partners LLC ("777"), a private investment firm based in Miami, Florida[2].  At all times relevant, Joshua C. Wander ("Wander") and Steven W. Pasko ("Pasko") have served as President[3] and Chief Executive Officer of SuttonPark, respectively.  Wander and Pasko are also founders and managing partners of 777.

2.      Plaintiff is related to a woman named Lyndsy Noell ("Lyndsy" or "Ms. Noell"),

---

[1] http://suttonpark.com/company/
[2] https://777part.com/
[3] https://www.crunchbase.com/organization/suttonpark-capital#section-current-team

who unknowingly sold off her annuity in 2016 to SuttonPark and its affiliates for a lump sum. Rodney and Lori Goney ("Lori") are the parents of Ms. Noell, who is not a party to this action. T.N. is Lyndsy's minor son.

3.     Lyndsy was in a car accident on February 4, 2005, when she was 13 years old, en route to Jacksonville, Florida from Ocala, Florida.  She was taking a road trip with her parents, Rodney and Lori (together "the Goneys").  Lyndsy was seated in the back of the vehicle when a commercial truck hit the car that Lori was driving.  The impact shattered Lyndsy's face and she sustained severe head trauma (Exhibit A, Photos of Lyndsy After Being Admitted to the Hospital).  Lyndsy has had over 13 surgeries to correct the damage to her face. Lyndsy suffered from brain bleeds and severe mental impairment, as well as pain.  She has no vision in her left eye due to the injury and cannot make fully informed decisions due to her mental impediments (Exhibit B, Note from Physician Regarding Lyndsy's Recovery). Doctors have repeatedly told Lyndsy and her family that she will never be able to attend college, and the highest level of education that she can hope to reach is some type of vocational school (Id.)

4.     Lyndsy and the Goneys sued the commercial vehicle operator in a personal injury lawsuit in 2005.

5.     The Goneys took over Lyndsy's care and spent hundreds of thousands of dollars on Lyndsy's rehabilitation and surgeries to repair her face, divesting their life savings and future retirement income for the sake of their daughter.  Rodney started working a second job, took out a second mortgage on the family home and multiple lines of credit, while Lori started cleaning rooms at hotels and waiting tables for money that they needed to pay for their daughter's recovery.  Lyndsy suffered from brain bleeds and is permanently blind in her left eye.  Her face was rebuilt with prostheses and grafts from other parts of her body.

6.     As part of Ms. Noell's recovery, Lyndsy took prescription painkillers to manage the exorbitant pain that she was enduring on a daily basis. Eventually, her acquired tolerance for said pain killers led her down an unfortunate path in which she became addicted to street drugs that allowed her to cope with her chronic pain.

7.     In 2007, 15-year-old Lyndsy settled her personal injury claim with Travelers Insurance.  After paying legal and medical fees, $1,000,000 from her settlement was placed into an annuity.

8.     By 2015, Lyndsy was no longer a minor and had started taking a variety of street drugs, ranging from cocaine to heroin.  She saw a secondary-market structured settlement commercial on television that offered a lump sum payment in exchange for the sale of her income-generating annuity.  Lyndsy had no source of income, no ability to work or earn money (due to her addiction and mental impairments), a three-year-old child (T.N.) and an unfortunate drug addiction.  She called 123 Lump Sum[4], a structured settlement company based in South Florida.  Without having Lyndsy sign a contract or any paperwork at all, 123 Lump Sum offered Lyndsy $1,000.  Within minutes, she retrieved funds via Western Union from 123 Lump Sum. Ms. Noell, who was vulnerable and needed cash to support her addiction, quickly became hooked to the steady flow of funds that she could use to purchase drugs.  In fact, any larger sum of capital available through sell-offs of her annuity deepened her addiction, since she was able to buy more narcotics all at once.

9.     Lori began to notice Lyndsy's strange behavior and found FedEx envelopes with paperwork from different structured settlement companies.   She noticed that Lyndsy was pawning off her possessions and behaving strangely.  Lori attempted to intercede and keep

---

[4] Wander got his start in the secondary market of purchasing annuities at 123 Lump Sum: https://joshuawanderflorida.wordpress.com/about/.

Lyndsy from selling off the only source of income that Lyndsy had, which supported both Lyndsy and T.N..

10.    The secondary structured settlement market is unregulated and unlicensed. Though there are Structured Settlement Protection Acts (SSPAs) in many states, the structured settlement industry represents the dark underbelly of the specialty finance world.  Many SSPAs are not followed, and some judges spend less than five minutes on cases that determine the financial futures of young, vulnerable people.  The Judge often never sees the policyholder in person, and the policyholder is not always represented by independent counsel. Though nail technicians, financial advisors and barbers all need licenses to perform their services, a company engaged in the predatory practice of purchasing annuities has absolutely no oversight from any agency.  There are a handful of players who manipulate vulnerable individuals into signing over their annuities to companies for a quick fix of a lump sum.  Lyndsy and her sole beneficiary, T.N., were just two of those vulnerable individuals.

11.    The leaders of this industry partake in distribution and trafficking of narcotics[5], kidnapping, extortion, bribery and sexual abuse (Ex. C, Letter from Lori Goney to Edward Stone, Documenting Sexual Abuse Lyndsy Experienced), all at the expense of their vulnerable clients.  In 2015, a representative from 123 Lump Sum invited Lyndsy to Key West with him for a "free vacation."  While secluded with this male representative for an all-expenses paid trip to Key West, Lyndsy signed a contract to sell off the first portion of her annuity.  Lyndsy was

---

[5] Dan Cevallos of Advance Funding LLC, a structured settlement company, is a convicted felon who served time in prison and has a lifetime ban from FINRA (https://structuredsettlements.typepad.com/structured_settlements_4r/2020/02/how-is-recidivist-dan-cevallos-of-advance-funding-not-in-jail.html).  Defendant SuttonPark Capital's president and co-founder is a former cocaine trafficker who spent fifteen years on probation for attempting to smuggle 25 kilograms of cocaine through the US mail: https://mugshots.com/US-States/Florida/Alachua-County-FL/Joshua-Craig-Wander.2290060.html.  Robert Shapiro of Woodbridge Stuctured Funding LLC was sentenced to 25 years in prison for ill-gotten gains in the structured settlement funding industry (https://www.sec.gov/whistleblower/award-claim/award-claim-2019-23).  The list goes on.

incapacitated when she signed over her income-generating annuity. Lyndsy had left T.N. with her parents, the Goneys, and then spent the weekend purchasing and doing drugs. In the midst of this "vacation," she signed over $42,385.77 of her annuity for a lump sum of $20,000.

12.    In less than a year's time, Lyndsy unknowingly sold off her entire annuity. The following chart and graph shows just how unfavorable those deals were:

CHART: ANNUITY SOLD vs. LUMP SUM AMOUNT RECEIVED

| Date | Annuity Sold ($) | Lump sum amount ($) | Percentage Reduction (%) |
|---|---|---|---|
| August 26, 2015 | $42,385.77 | $20,000.00 | -52.8% |
| September 11, 2015 | $89,052.84 | $23,000.00 | -74.2% |
| September 11, 2015 | $45,167.28 | $13,000.00 | -71.2% |
| September 24, 2015 | $47,524.35 | $24,000.00 | -49.5% |
| December 14, 2015 | $90,755.98 | $13,556.00 | -85.1% |
| February 19, 2016 | $792,759.82 | $180,000.00 | -77.3% |



5

14.     Lyndsy's experience is not a mere one-off or aberration in the structured settlement industry (Exhibit D, Tierra Douglas v. Liberty Settlement Solutions LLC, SuttonPark Structured Settlements LLC et al, Circuit Court of Broward County, Florida; No. 19-015927). Tierra Douglas of Missouri is another young woman who was swindled by the bad actors at SuttonPark and its affiliates and is suing for damages in the Circuit Court of Broward County. Douglas is a young, disabled woman who SuttonPark and Liberty Settlement Funding (a company that was previously owned and operated by SuttonPark and 777) allegedly took money from and represented to her that they would invest her money in a band. Douglas suffers from schizophrenia, schizoaffective disorder and has a history of hallucinations and delusions.  Rather than invest in any band, Defendant and their affiliates built a swimming pool in North Miami. Though this material may seem like the story behind a Netflix original, it is not.  It is real life.

15.     Lyndsy was repeatedly kidnapped and secluded from her family and taken away to hotels or apartments where she was provided with drugs, extorted with threats to disclose information and videos of her taking drugs, and bullied into assigning her annuity.  Most appallingly, SuttonPark representatives often absconded with then three-year-old T.N. as well, in the middle of the night, to locations hundreds of miles away from the Goneys.[6]

16.     In late 2015, Orlando Rodriguez ("Rodriguez") of SuttonPark Capital's subsidiary, Liberty Settlement Solutions LLC ("Liberty"), messaged Lyndsy on Facebook. Lyndsy, at this point, had become addicted to the quick access of large sums of money. Representatives from SuttonPark and their web of companies took Lyndsy and T.N. from their home in Jacksonville down to Hollywood, Florida in January of 2016 (Exhibit E, Email from Lyndsy to her brother, Brent). SuttonPark representatives coerced Lyndsy into signing for a

---

[6] The Goneys eventually obtained power of attorney over Lyndsy and her son in 2016 due to Lyndsy's inability to make coherent decisions.

$2,000 apartment rental agreement in Hollywood. Lyndsy contacted her brother, Brent, telling him she was scared and did not have food or money for her or her child. SuttonPark wanted Lyndsy down in Hollywood for 2-3 weeks. Brent and Lori drove 330 miles to retrieve Lyndsy and T.N.. SuttonPark representatives had told Lyndsy there would be food, a car service, money for a shopping spree and clothing for Lyndsy and T.N. None of that turned out to be true.

17.    Though Lyndsy had been scared by the danger SuttonPark had put her and her child in, the lump sum of capital and access to drugs were too intriguing for Lyndsy to stay away. She was addicted to heroin and could not always wait for her monthly annuity check to come through. The Goneys, T.N. and Lyndsy were still living in Florida but they all had traveled to Pennsylvania, where they all now reside, to watch the Superbowl on TV with their extended family on February 7, 2016.  Though Lyndsy told her family that she would join them for the event, SuttonPark Capital had other plans for her.  Lyndsy informed the Goneys that she was in Florida at a rehabilitation center, and left T.N. with the Goneys.  In fact though, Lyndsy was at a hotel in Fort Lauderdale, selling off a portion of her annuity to SuttonPark while under the influence of heroin and cocaine.

18.    Lyndsy is not alone.  John Darer is a secondary structured settlement industry watchdog and is one of the few individuals who have monitored, published and exposed the manipulative behavior of the players in this industry.  Mr. Darer's website provides the only source of regular news about predatory transactions in this industry, and he has written 57 articles about SuttonPark Capital and its subsidiaries alone.  Mr. Darer writes, "It is common knowledge that the structured settlement secondary market in general is littered with horrific stories of financial predation of young adults, when they turn age 18 and shortly after."[7]  Lyndsy

---

[7]
https://structuredsettlements.typepad.com/structured_settlements_4r/2019/07/why-cbc-settlement-funding-cant-be-tr
usted-with-your-childs-structured-settlement.html

was one of those young adults.

19.     Since this is a relatively niche industry, there is little to no media coverage and very little awareness about the bad actors.  Furthermore, the individuals who are being manipulated are the most vulnerable members of society; these individuals are voiceless and lack access to the justice system. They are the downtrodden, the poor, the non-elite.

20.     Prior to 2002, it was impossible to sell an annuity.  Structured settlements ("structures" or "annuities") were tax-free, lifelong income sources that Congress believed would keep the indigent off of welfare[8].  Structures were irrevocable, so that the beneficiaries could essentially receive a tax windfall[9].   In 2002, the federal Excise Tax Bill (Internal Revenue Code 5891) was passed, and the secondary market for purchasing structured settlements was born[10].  According to the Legal Examiner, "With zero regulatory oversight, the factoring industry (or secondary market industry) flourished by ripping off annuitants and paying pennies on the dollar for what is considered to be a very valuable investment asset" (supra).

21.     Companies that have issued the annuities (John Hancock, MassMutual, Prudential, New York Life, Met Life and others) have turned a blind eye to the secondary market of purchasing structured settlements, also called "factoring." The only company that has offered education and is now running a program to buy back the annuities, is Berkshire Hathaway Group Structured       Settlements       (BHGSS)       (https://www.bhstructures.com/Forms/ Hardship%20Program.pdf).   Dubbed the "Hardship Program," BHGSS is offering information and education to policyholders in an effort to encourage their policyholders to hold onto their paper.  BHGSS offers a pamphlet that outlines why the policyholder entered into the structured settlement in the first place (Id.)

---

[8] https://milestone.legalexaminer.com/legal/the-evolution-of-the-structured-settlement-industry/
[9] Id.
[10] 26 U.S. Code § 5891

22.     Below BHGSS's statements reiterating the prudent choice their policyholders made in entering into a structured settlement, BHGSS warns their policyholders of the companies offering to "undo" the policyholders' structured settlements (supra).  BHGSS warns,

> These companies may employ aggressive tactics to encourage you to make a bad decision. If you respond to their advertising or if they directly contact you and you show any interest, they may reach out to you repeatedly to try to get your business. If you exhibit a willingness to do a bad deal and sell some payments, they may aggressively encourage you to enter into repeat transactions. Since the sale of payments is public record, their competitors may also start to pursue your business.

Supra.

23.     BHGSS describes the tried and true tactics of the structured settlement companies that vigorously pursued Lyndsy, a young adult who had an unfortunate accident that led to an even more unfortunate addiction.  They used the referenced "aggressive tactics" by intriguing her with quick Western Union payments, access to drugs and a lump sum of money that she had never before seen in life, all to the detriment of her minor son, T.N..

24.     Much to Lyndsy's detriment, she was not a BHGSS policyholder.  Her structured settlement was issued by John Hancock, a company that did not have a "Hardship Program." BHGSS outlines in its Hardship Program pamphlet that if the policyholder is offered a bad deal, BHGSS will intervene (supra).  No such Hardship Program or policy of intervention exists anywhere on John Hancock's website or in their marketing information[11].

25.     The American Bar Association has also described the sale of structured settlements to factoring companies as fraught with risk.  The American Bar Association notes, "There have also been several instances where approval orders were forged, once by an

---

[11] John Darer announced on his website on February 5, 2020 that John Hancock has announced a roll-out of an exchange program.  There is no information available online regarding this program, except on Darer's website:
https://structuredsettlements.typepad.com/structured_settlements_4r/2020/02/john-hancock-life-introduces-structured-settlement-commutation-program-for-annuitants.html

employee of a New York law firm representing factoring companies, and then by an attorney who represented factoring companies in Florida. In the latter case, over 100 approval orders were forged."[12] The use of DocuSign and electronic signature software has increased this fraud, as was the case for Lyndsy.  On top of being incapacitated due to drug abuse, Ms. Noell unknowingly handed over access to her e-mail to Kevin Johnston ("Johnston," a SuttonPark representative), Rodriguez, and other structured settlement company representatives, who logged into her DocuSign accounts to forge signatures.

26.     As John Darer writes[13],

A judge who may not have examined the seller in person is the only thing that stands between a vulnerable seller and financial oblivion. There have been some true horror stories that must see the light of day.  An example of the kind of abuse I'm referring to is where someone with cognitive deficits has had multiple sell transactions approved in a year and has never appeared before a judge at any hearing before a "qualified order" was obtained. Blistering Washington Post articles about the alleged exploitation of annuitants in Baltimore inner city at the hands of Access Funding inspired legislative and judicial reforms in Maryland. Similar loud pot banging raised awareness in other states such as Virginia, Florida and in the District of Columbia. There is still plenty of work to be done.

Lyndsy and her son, Plaintiff, along with Rodney and Lori, lived through one of those "horror stories."  The judicial system failed the Noells and Goneys, and now Lori and Rodney Goney have had to pick up the pieces after SuttonPark decimated Lyndsy's financial future.

27.     This action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful and predatory practices.

**JURISDICTION AND VENUE**

28.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiff (a resident of the State of Pennsylvania) and Defendants. Defendant SuttonPark Capital LLC has its headquarters in the

---

[12] https://www.americanbar.org/groups/litigation/committees/admiralty/practice/2018/recycled-annuities/
[13] http://www.structuredsettlementwatchdog.net/faq.html

State of Florida, an office in New York, and is incorporated in Delaware. Defendant SuttonPark Structured Settlements LLC is owned by SuttonPark Capital LLC, which is owned by 600 Partners LLC.  600 Partners LLC has one member which resides in Florida. None of Defendants are Pennsylvania corporations.  Further, this action involves a matter in controversy that exceeds the sum of $75,000.

29.    This Court has supplemental subject matter jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

30.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because SuttonPark maintains an office and does business in this district.

**PARTIES**

31.    Plaintiff T.N. is a minor child who resides with Rodney and Lori Goney in Uniontown, Pennsylvania. T.N. is the minor child of Lyndsy Noell. Rodney Goney is T.N.'s Power of Attorney, and that Power of Attorney gives Mr. Goney the power to bring legal proceedings on behalf of T.N. Exhibit AA, Power of Attorney.

32.    Defendant SuttonPark Capital LLC is a privately held Delaware limited liability company with a principal place of business in Boca Raton, Florida, and an office in New York, New York.

33.    SuttonPark Structured Settlements LLC is owned by SuttonPark Capital LLC, which is owned by 600 Partners LLC.  600 Partners LLC has one member which resides in Florida.

**FACTUAL ALLEGATIONS**

I.    **BACKGROUND**

11

34.    SuttonPark Capital LLC was originally launched ten years ago in 2010, and is a self-described "independently owned investment firm that specializes in the origination and structuring of esoteric investment-grade assets.[14]" Its founder and managing partner is Steven W. Pasko, and its President is former drug trafficker, Joshua Craig Wander (Ex. F, Criminal History of Joshua Wander).  Frederick Love is an attorney who serves as Executive Vice President and General Counsel of SuttonPark.

35.    SuttonPark has since become the leading wholesale aggregator and servicer of structured settlements in the United States. Though many, if not most, investors are not aware of this asset class, SuttonPark Capital has thrived in this niche environment. On November 8, 2019, the structured settlement investor prepared for, "the biggest-ever securitization in the asset class" (https://www.abalert.com/search.pl?ARTICLE=186706).  Mr. Wander, though cited in the article as a "founder" of SuttonPark and is the sole source for the information of SuttonPark's $700 million securitization, he is nowhere to be found on the SuttonPark Capital LLC website.

36.    This is not a mere misstep or oversight by the webmaster of SuttonPark Capital. Wander's history as a drug trafficker would significantly interfere with SuttonPark's ability to raise capital and close on such a large securitization.  The material omission of Wander from the company's website and a disassociation of Wander from SuttonPark's brand, is completely intentional.  Upon information and belief, Wander's history would raise far too many questions from larger funds and investors, and would likely impede SuttonPark's ability to raise capital.

37.    Lyndsy was 13 years old at the time of her car accident that led to permanent blindness in her left eye and traumatic brain injury.  Lyndsy, now 32 years old, has no assets and limited income. She lives with her parents, who support both her and T.N., who is now 10 years old.

---

[14] http://suttonpark.com/about-us/

38.     To say Lyndsy Noell had a challenging life would be a drastic understatement. She has undergone dozens of surgeries, physical rehabilitation, drug addiction and recovery.  Her ex-husband who is also T.N.'s father never has and does not currently pay a dime to Lyndsy in child support to care for 7-year-old T.N..  For almost a year, SuttonPark and the representatives from its affiliated web of companies kept Lyndsy and T.N. away from the Goneys, demonizing Lori and Rodney and purchasing narcotics to abuse alongside Lyndsy, with utter disregard for the health or well-being of then 3-year-old T.N., who witnessed these illicit activities while being isolated from his grandparents in a hotel with his mother and various male associates who worked for SuttonPark

39.     As Lyndsy says in her letter to Edward Stone and a private investigator,

> I have the email of a house Orlando sent me and said for me to make a bank account with his name on it and he would buy and manage the property and I would get commission. Orlando would tell me I only had to pay a few hundred dollars back after I signed the annuity deal and it would not be taken out until years later when my check would be much higher, when I had no monthly check coming in and returned home to my parents I called him with my mother listening and asked why didn't I get a check for the month and if he knew anything about it , he said that wasn't supposed to happen and would call me back, but he never did. I would feel obligated to sign their papers when they picked me up and I had no money or extra clothes with me, each time they said it was because of an error on the page, a typo that had to be corrected.

(Ex. G, Letter from Lyndsy to Stone).  Lyndsy was consistently manipulated, and a representative from SuttonPark went as far as trying to convince Lyndsy to set up a bank account with Lyndsy's money in it and Orlando Rodriguez's name on it.

### SuttonPark Capital President Joshua Wander's Criminal History

40.     Wander's missing profile on the SuttonPark website and yet his prominence online when it comes to serving as the mouthpiece for SuttonPark is highly relevant to this action.  First, Wander's run-in with the law and a 15-year probation period for trafficking cocaine

through the United States mail was his final encounter with the criminal justice system "on the record." But, his separation from the web presence and Wall Street-esque approach to presenting a well-rounded management team on suttonpark.com only tells part of the story that brings T.N. before this Court.

41.     Wander has a long record of run-ins with the law (Ex. F, Circuit Court of Alachua County). From 2001 through 2004, Wander's progression into and access to the world of narcotics grew. The Gainesville Sun reported on February 16, 2003 that Wander was arrested after the Florida Department of Law Enforcement and a U.S. Postal Service inspection unit conducted a search warrant "following a controlled delivery of a package" (https://www.gainesville.com/article/LK/20030216/News/604151716/GS).

42.     The Florida Department of Law Enforcement and the U.S. Postal Service inspection unit used this search warrant to open up a package that was sent to Wander (https://www.redandblack.com/news/alabama-man-indicted-faces-murder-charges/article_473a3 734-9de4-5e78-a6f5-d84d6c421edd.html). The package contained 31.2 grams of cocaine; law enforcement attached a tracking device to that package. Wander received and opened the package, and was subsequently arrested, admitting the cocaine belonged to him. Wander pleaded no contest to the charges in 2004 (Ex. H), avoiding a 26-year prison sentence. Instead of a prison sentence, Wander was put on probation for 15 years.

43.     Though a decade of probation may lead to reform for many young men who get a second chance in life, the run-in with authorities only emboldened Wander and those around him. The lesson Wander learned was to never get caught.

44.     Wander began to work for 123 Lump Sum in 2003. He then joined Pasko and Marc Waldman at SuttonPark in 2010. On February 27th, 2014, Mr. Wander's motion for early

14

termination of probation was granted, and from there, in 2015 Mr. Wander began to build an alternative finance fund, 777 Partners LLC.

45.    The existence of SuttonPark pre-dated the existence of 777, but once 777 was formed, SuttonPark became a subsidiary of 777.  777 provided Wander with the opportunity to be the face of an organization, with the track record of Pasko (who had no criminal history) on his side.

### SuttonPark's Activities

46.    From August 2015 through June 2016, Lyndsy sold off $1,107,646 of the annuity she had received from her personal injury lawsuit, mostly to SuttonPark.  In exchange, she received a total of $273,556 (Ex. I, List of Wires from R.A. VII LLC, Showing How Much Lyndsy Received From SuttonPark) from SuttonPark and other structured settlement companies. SuttonPark did not always act through SuttonPark Capital LLC, it would often operate through shell companies like R.A. VII, LLC, making transactions difficult to track and leaving it up to vulnerable parties to chase after a web of companies (Ex. J, Final Order in Re: L. Noell, 2/19/16).  Although the men who approached Lyndsy and absconded in the night with her and her child claimed to be from "Liberty" (a company SuttonPark owned), all of her contracts and the sell-offs were with R.A. VII, LLC, SuttonPark Structured Settlements LLC and SuttonPark Capital LLC.  Fred Love, SuttonPark's General Counsel, was a member of Liberty as recently as April 2, 2019 (Ex. K, 2019 Foreign Limited Liability Company Annual Report).

47.    This "web of companies" prevented Lori and her family from finding out in which counties and courts Lyndsy's cases were being sold off.  Lori would search for the name "Liberty" but could find nothing.  Later, Lori and Rodney learned that SuttonPark used a variety of shell companies for the sell-offs to prevent any concerned family members or third parties

from interfering with the transaction.

48.     SuttonPark's employees did not effect this transaction through voluntary and conscious signatures from Ms. Noell.  By keeping Lyndsy in a drugged stupor, becoming "friends" with Lyndsy and demonizing her family, SuttonPark's employees gained Lyndsy's trust at the most vulnerable point in her life.  Lyndsy unconsciously, while under the influence of drugs, gave SuttonPark access to her email passwords, credit cards and personal information.  SuttonPark used her vulnerability to their advantage.  During Lyndsy's inebriation, SuttonPark employees accessed her email and charged her credit card without her knowledge.  SuttonPark also gave Lyndsy "burner phones" to use and throw away in order to keep their outreach to Lyndsy a secret from Lori and Rodney.  Furthermore, they took Lyndsy's old phone away to eradicate any evidence of their interactions with her.

49.     When Lyndsy met SuttonPark, she had not been adjudicated incompetent by any court of law. However, she was per se incompetent and child-like in her inability to care for herself. At the time of selling off her structured settlements, she had no job, was under the influence of drugs almost all of the time, had open sores all over body, did not take care of her own personal hygiene and did not bathe without being prompted by her parents, lost most of her teeth due to drug use, wore the same clothing everyday and could not stop herself from nodding off. Lyndsy was made to depend on her parents from the actions of SuttonPark- a clear and natural consequence, in this case, was that when Lyndsy lost her livelihood due to SuttonPark rendering her incompetent and forcing her to sign away her annuity by plying her with drugs and cutting her off from a support system, it made her son a foreseeable plaintiff.

50.     Rank and file employees were not the only individuals feeding Lyndsy with drugs.  Lyndsy met the owners of SuttonPark's subsidiary, Liberty, who provided Lyndsy with

16

pain killers and gave Lyndsy access to their heroin dealers.

51.   While SuttonPark abused Lyndsy and took advantage of her vulnerable state, three-year-old T.N. was along for almost every step of the way.  Before signing documents, SuttonPark representatives would give Lyndsy pain pills.  T.N. would be sitting in the back of the car.  While Lyndsy was high from drugs that SuttonPark secured for her and at a pharmacy, she was thrown out and passed out in the car of a SuttonPark representative.  All the while, T.N. was there.  When Johnson got high himself at an Olive Garden restaurant bathroom and Lyndsy helped walk him to his car, T.N. was there.  SuttonPark had a blatant disregard toward the health and well-being of this child who depended on his mother and mother's annuity to stay alive.

52.   On February 14, 2016, T.N. was able to call his grandmother and asked her to please pick him up.  Lyndsy, in her inebriated state, and the SuttonPark representatives had the child in a hotel, away from Lori and Rodney's reach.  Since T.N. was only three years old at the time, he had no way of communicating to his grandmother where he was.  In fact though, they were just four miles away from both Lyndsy and Lori and Rodney's home.  SuttonPark solely kept the mother and child in a hotel to ensure that Lori and Rodney would have no knowledge of their whereabouts and would not be able to interfere with the sell-off.

### Lori's Growing Suspicions

53.   Lori was aware of Lyndsy's addiction and grew concerned about the company that was repeatedly driving her daughter and grandson hundreds of miles away from her home.  Lori saw that her daughter was pawning off her belongings for money, and shortly thereafter learned what she was using the proceeds for.  When Lori could not locate her child and grandchild for days or weeks at a time, she would contact SuttonPark's employees in an attempt to locate her (Ex. L, Facebook Message to Kevin Johnson).  Lori took to the Internet and began to report a

17

subsidiary of Defendants SuttonPark to the Better Business Bureau (BBB) (Ex. M, Beacon Network Investigations Report; Ex. N, Complaint to BBB).    Kevin Johnson instructed Lyndsy to take a drug test.  At around 12 PM on February 22, 2016, Johnson took Lyndsy to the Smoke Shop located at 12777-22 Atlantic Blvd. in Jacksonville, FL.   Johnson directed Lyndsy to purchase a product called, "Magnum Detox Synthetic Urine" (supra, p. 6).

54.    Lyndsy, Plaintiff, and Johnson had been staying in the same room at the Four Points Sheraton (supra, pp. 7, 23-25, Ex. O, Picture of T.N., Taken by Kevin Johnson, Ex. P, Picture of T.N. and Johnson).   Initially, Orlando Rodriguez of SuttonPark was staying with Lyndsy and Plaintiff.  Johnson replaced Rodriguez at some point.  Once Rodriguez left the hotel, he threatened Lyndsy by telling her, "If this continues I will leave your videos all over social media…or you don't remember??   All those stops you made me do so you could take heroin????? Videos of you high out of your mind!!!!  Of that one night they called me from the hotel that you were running around like a maniac I got videos of that too" (Ex. Q, Facebook Messages from Rodriguez to Lyndsy).  Lyndsy was held hostage and was being extorted; if she spoke up to anyone, she faced humiliation and incrimination.

55.    Lori did not hesitate to contact Rodriguez either (Exhibit R, Facebook message from Lori to Rodriguez).  Lori was a frantic mother, searching for her child and grandchild, and her attempts to locate her family were met with threats.  Rodriguez stated to Lori via Facebook Messenger, "If you contact me again you will suffer the consequences."   SuttonPark's representatives used intimidation to scare off the Goneys and kidnapping to keep the Noells out of reach.

56.    After purchasing the synthetic urine, Johnson drove Lyndsy to Care Spot, a medical clinic, where she passed a drug test by pouring synthetic urine into a container that was

submitted for testing, as Johnson instructed her to do (supra, p. 8).  Lyndsy had been taking three grams of heroin on a daily basis (supra, pp. 11-18), she would not have been able to pass any drug test under those conditions.

57.    Lori made her skepticism of Lyndsy's competence to sign away her annuity known to the Courts and any agency to which she could write a letter (Ex. S, Letter from the Office of Inspector General responding to Lori's Letter about Liberty Settlement Funding, SuttonPark's subsidiary).  As early as December 2015, Lori would write to judges and their clerks consistently, urging them to block the sale of Lyndsy's annuity (supra, p. 30, Ex. T, Letters to Judges Martin Fitzpatrick, Circuit Judge, Second Judicial Circuit of Florida, Judge Gary L. Sweet and Judge Lisa S. Porter).  To prove Lyndsy's so-called "competence" to sell off her annuity, SuttonPark's principals took Lyndsy to see Dr. Elliott Rosenbaum of Jacksonville, Florida. Lyndsy failed the 6-hour test after she nodded off from taking heroin. She returned to retake the test on a different day. SuttonPark representatives directed Lyndsy to take cocaine before the test, and during a break halfway through to stay awake.

58.    Lydnsy and the principals of SuttonPark were partaking in these illegal activities with 3-year-old T.N. in tow.  Through Lyndsy's weakness of heroin addiction, SuttonPark's agents manipulated their way into positions that gave them control of Lyndsy and T.N.'s bank account, email, access to food, shelter and even phone calls by taking away her cell phone and giving her a "burner" phone.  In Spring of 2016, Lori and Rodney petitioned for custody of T.N. due to the danger they believed that their grandson was in (Ex. U, Lori and Rodney's Petition for Custody of T.N.).  Lori and Rodney's petition for custody failed, but the Florida Department of Children and Families (DCF) turned over T.N. to Lori and Rodney shortly after, because DCF recognized that Lori was per se incompetent.  Lori had sent letters to Judge Martin Fitzpatrick,

19

the Judge presiding over one of Lyndsy's annuity sales, and Judge Fitzpatrick's Judicial Assistant reported the dangerous situation T.N. was in on or around February 17, 2016 to DCF (Ex. V, Email from Judge Fitzpatrick's Judicial Assistant to Lori).

59. T.N. has already manifested severe emotional distress and trauma from watching his mother being plied with drugs, sexually abused and "nodding off" during periods of intoxication. T.N.,, as a result of these horrific experiences, has had to see a psychotherapist and suffers from anxiety whenever he witnesses family conflict.

60. Through intentionally deceptive practices, designed to mislead the Courts, Lyndsy was deemed fit to sell off her annuity. Eight separate sales of Lyndsy's annuity to Defendants SuttonPark took place over a period of six months.

61. Lori went so far as to contact the National Association of Settlement Purchasers (NASP), a trade association of structured settlement companies (Ex. W, Letter on 2/23/16 to NASP). The Association rebuffed her calls for help.

62. At the time, Lori did not realize that Liberty was simply Dorothy, and did not know there was anyone else behind the curtain. SuttonPark was the actual Wizard of Oz, and their general counsel, Fred Love, was the president of NASP (https://www.nasp-usa.com/board.php).

**<u>Lyndsy Loses Access to Her Annuity</u>**

63. On July 9, 2016, Lyndsy stopped receiving her annuity check. When she called Rodriguez to determine what had happened to her money, he told her he would "look into it." Lyndsy never heard from Rodriguez ever again.

64. Due to this loss in her income, Lyndsy could no longer afford to support herself or her child. She had no income, no ability to buy food and could not keep her lights on. Lyndsy

20

gave Lori and Rodney Power of Attorney (effective in Duval County, FL on July 13, 2016) over her child and herself, and she moved in with Lori, Rodney and T.N.. Rodney took overtime and holiday work to make ends meet for his family.

65.    After many failed attempts at rehabilitation, Lyndsy was admitted to North Florida Comprehensive Treatment Center in Jacksonville, FL on July 28, 2016 and stayed there until January 10, 2017 when the Goneys and Noells relocated to Pennsylvania.

66.    Ironically, though Congress established the structured settlement to prevent vulnerable people from becoming dependent on their families and welfare, Lyndsy ended up not being able to support herself due to SuttonPark's ability to transfer Lyndsy's structured settlement out of Lyndsy's bank account without her conscious consent. Lyndsy and her son today are Medicaid recipients and receive government aid. With Lyndsy's annuity, she neither received nor needed public benefits.

### Lori Takes to Social Media

67.    SuttonPark's principals consistently told Lyndsy that only a tiny amount of her annuity would be taken out of her monthly payment if she signed an agreement with SuttonPark. They stated that she, "wouldn't even notice that any money was missing." This was patently false. Eventually, Lyndsy's check stopped coming, and she in fact did notice the money was missing, contrary to what she was told by SuttonPark representatives. Lyndsy had no idea what she had signed away when she took drugs before signing contracts with SuttonPark's employees; she had no idea that she would be no longer able to support herself and T.N..

68.    Lori and Rodney took their child and grandchild into their home. Though SuttonPark was no longer interested in Lyndsy since they had taken all of her funds, Lori had not forgotten what the company had done to her child and then 3-year-old T.N.. Lori wrote honest

21

reviews about SuttonPark and its parent company on Google and Yelp (Ex. X, Lori's Google Review about 777 Partners LLC).

69.     Lori e-mailed Fred Love, General Counsel of SuttonPark, informing him that she would continue to tell the public her child and grandchild's story, and her statements were not defamatory in nature, since the "story" was true.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Negligence)**

70.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

71.     By the actions described above, among others, Defendants SuttonPark owed a duty to three-year-old T.N. when they took him from his home and gave his mother drugs, leaving her intoxicated and unable to care for her child.  Defendants SuttonPark breached this duty by exposing three-year-old Plaintiff to harm.

72.     As a direct and proximate result of Defendants' SuttonPark unlawful conduct, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief to the greatest extent permitted by law.

73.     Plaintiff also seeks injunctive relief as may be necessary and appropriate to remedy Defendants' SuttonPark unlawful practices.

### SECOND CAUSE OF ACTION
**(Gross Negligence)**

74.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

75.     By the actions described above, among others, SuttonPark's misconduct rises to

the level of gross negligence against Plaintiff based on their reckless indifference to the health and safety of a minor child by failing to use even slight care when taking three-year-old T.N. from his home.

76.     As a direct and proximate result of SuttonPark's unlawful conduct, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief to the greatest extent permitted by law.

77.     SuttonPark's unlawful actions constitute malicious, willful and wanton violations of the law, for which Plaintiff is entitled to an award of punitive damages.

78.     Plaintiff also seeks injunctive relief as may be necessary and appropriate to remedy SuttonPark's unlawful conduct.

**THIRD CAUSE OF ACTION**
**(False Imprisonment)**

79.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

80.     By the actions described above, among others, Defendants intended to and did confine Plaintiff in hotels and apartments throughout the state of Florida.

81.     Plaintiff was conscious of the confinement, and did not consent to the confinement.

82.     The confinement was not otherwise privileged.

83.     As a direct and proximate result of SuttonPark's unlawful conduct, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief to the greatest extent permitted by law.

84.     SuttonPark's unlawful actions constitute malicious, willful and wanton violations of the law, for which Plaintiff is entitled to an award of punitive damages.

85. Plaintiff also seeks injunctive relief as may be necessary and appropriate to remedy SuttonPark's unlawful practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State of New York;

B. An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the practices complained of herein;

C. An order directing Defendants to cease all unlawful activities, remove anyone with criminal history or ties from their organization and to take such affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated;

D. An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and non-monetary harm they have suffered, including, but not limited to, compensation for mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering and emotional distress;

E. An award of punitive damages, in an amount to be determined at trial;

F. An award of liquidated damages, in an amount to be determined at trial;

G. Prejudgment interest on all amounts due;

H. An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I. Such other and further relief as the Court may deem just and proper.

25

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 12, 2024
Armonk, NY

Respectfully submitted,

*/s/ Farva Jafri*
*Farva Jafri, Esq.*
**JAFRI LAW FIRM**
50 Evergreen Row
Armonk, NY 10504
Telephone: (224) 267-0043
Facsimile: (224) 228-6721
farva@jafrilawfirm.com

*Attorney for Plaintiff*

25